Peggy WILLIAMSON,
Plaintiff-Appellant,

v.

Charles R. "Dick" BROWN,
Defendant-Appellee.

No. 80–3174.

United States Court of Appeals,
Fifth Circuit.
Unit A

May 28, 1981.

Paul Henry Kidd, Monroe, La., for plaintiff-appellant.

Cotton, Bolton, Roberts & Hoychick, W. D. Cotton, Rayville, La., William B. Ragland, Jr., Voelker, Ragland, Bracken & Crigler, Lake Providence, La., for defendant-appellee.

Before BROWN and TATE, Circuit Judges and SMITH,* District Judge.

PER CURIAM:

The legal representative of the minor child of the decedent Williamson brings this Louisiana diversity action against the defendant Brown. In claiming damages for wrongful death, the plaintiff contends that Brown struck Williamson on the head, causing injuries from which he died. Since there were no witnesses to the alleged altercation, the plaintiff depends upon circumstantial evidence relating to the type and place of head injury that resulted in Williamson's death. After bench trial, the district judge entered judgment that the plaintiff take nothing. Pertinently to the issue raised by the plaintiff's appeal, the district court found that there had been no blow on the *top* of Williamson's head, as the plaintiff contends (for, if so, the circumstantial evidence points to the defendant Brown as having so struck Williamson). The medical evidence accepted by the court

---

* District Judge of the Northern District of Mississippi, sitting by designation.

as credible and preponderating shows only *one* impact, and that to the back of Williamson's head (a finding consistent with the defendant's theory that Williamson fell while intoxicated and struck his head on the pavement, without any fault on the part of the defendant Brown). We affirm the district court's judgment dismissing the plaintiff's claim, being unable to hold that the trial court's findings are clearly erroneous.

*The Sole Issue Raised by the Appeal*

On her appeal, the plaintiff raises one issue only, as stated in her brief: Did the trial court err "in finding that the decedent suffered only a single injury to his skull, and that to the back of his head?" This issue is to be resolved solely upon an analysis of the medical evidence. The relief apparently sought, if we indeed conclude that *two* head injuries were sustained by the decedent, is to remand to the district court for it to reformulate its findings and conclusions in the light of this changed finding.

For present purposes, then, the plaintiff-appellant does not attack the trial court's findings that the evidence does not prove any altercation between Williamson and Brown, who were friends of many years, nor support any finding that Brown was negligent in failing to secure medical assistance for Williamson after he passed out (as Brown testified was his belief) and was found lying on the pavement (at which time in he had sustained at least one skull fracture).

*The Factual Context*

On the night of the accident, the decedent Williamson and the defendant Brown had been drinking together in several bars in Tallulah, Louisiana. Around midnight they were seen talking in the parking lot of the Capri nightclub. The only testimony of what thereafter happened came from Brown.

He testified that he and Williamson first chatted at the back of Brown's truck. Brown then walked around the left side of his truck to go, leaving Williamson. Brown heard a loud shuffling noise. He stepped back around to the rear of the truck and found Williamson lying on the parking lot near Williamson's automobile. There were no outward signs of injury. Brown said he assumed that his friend had merely passed out as a result of drinking too much; the two had been imbibing for an extended period.

Brown first tried unsuccessfully to revive the decedent. He banged on the motel door for assistance, but no one responded. At that point, Brown saw the decedent's cousin, Carl Williamson, driving up, and he obtained his assistance. The cousin drove the decedent home, Brown following in his vehicle. They carried the decedent inside. He appeared to be asleep as they placed him on the couch. The cousin and Brown left a note to tell the decedent the location of his auto.

When the decedent Williamson failed to report for work the next day, a co-worker went to check on him; he found him still on the couch, unconscious, having apparent difficulty in breathing. An ambulance was called. Williamson was examined by a local general practitioner; he suspected a fracture at the base of the skull (a basal skull fracture) and directed that Williamson be taken to a hospital. There, a specialist diagnosed a blood swelling beneath the skull (a subdural hematoma) associated with a linear (crack or fine longitudinal line) skull fracture and a trauma to the head. The specialist performed a craniectomy (surgical incision of the skull) to relieve the pressure on the brain caused by swelling. Williamson died seven days later.

A pathologist performed an autopsy. He determined that death was caused by a profuse swelling of the brain resulting from a blow to the occiput, the back part of the skull.

*The Doctors: One Blow or Two?*

As earlier noted, the plaintiff appeals only the finding of fact by the district court that there was only one blow to the decedent Williamson's head, that at the back of the skull. The plaintiff contends that the evidence shows that, in addition to that blow, there was another blow at the top of Williamson's head—which, if so, would be substantial circumstantial evidence that Williamson was first struck by Brown and fell to the ground, resulting in the second

blow at the back of the head. The plaintiff argues that the trial court ignored a stipulation of the parties that there were two injuries to the head instead of one and in substituting its lay opinion that a four-inch skull fracture along the top of Williamson's head resulted from the single blow at the rear of the skull (apparently caused when Williamson fell, whether accidentally or instead due to a blow by Brown).

The lay testimony (from Brown, from the decedent's cousin, and from the deputy (Wilson) who found Williamson unconscious on the couch gasping for breath, and who ran his hands through Williamson's hair to search for blood or sign of a blow) is to the effect that no lay witness noticed any objective sign of any head injury. To resolve the issue, the district court was forced to rely solely upon conflicting medical evidence from apparently disinterested and able medical experts. The expert testimony is conflicting not only as to opinion of the causation of death, but also as to objective indicia as to whether and which contusions were present on the decedent's scalp.

*In urging that the district court erred, the plaintiff relies upon the following testimony:*

An x-ray was taken immediately after Williamson was transferred from the local emergency room shortly after he was found. It shows a horizontally oriented linear fracture along the left side of the skull (the left parietal bone) near the top midline of the skull. *See* exhibit P–1.

Immediately following this, the decedent was transferred to the Mississippi Baptist Hospital at Jackson, Mississippi. There, Dr. Walter Neill, a neurosurgeon, found a linear area of contusion and reddish discoloration of the scalp about four to five inches in length and about an inch below the midline of the skull, running from midskull and towards the rear. He did not observe any other signs of trauma, and he presumed this was the site of the injury. His diagnosis was that there was swelling of blood (a hematoma) beneath the skull, so he cut through the skull (performed a craniectomy) and drained about 120–160 cubic centimeters of fluid. Dr. Neill was of the

opinion that the hematoma resulted from a severe blow across the top of Williamson's skull, and that the contusion was likely caused by an elongated object that was probably a half to one inch wide.

Dr. Najeeb Klam, a forensic pathologist, likewise testified for the plaintiff. This specialist based his opinion solely upon an examination of the medical records and a reading of the depositions of the medical witnesses. He likewise concluded that the primary cause of the initial hematoma and of Williamson's subsequent death was a blow to the top of Williamson's head, which occurred first; the trauma at the back of the head (subsequently found by another pathologist), he thought, probably resulted from a fall caused by the first blow.

The plaintiff also relies upon what her counsel terms to be a stipulation by counsel that there were two "traumas" to the skull. R.II, pp. 106–108. This occurred during a colloquy between counsel. In essence, the counsel for the defendant admitted that the fracture to the top of the head "is one trauma. Now the doctors have called it a trauma. Now the other [the fracture to the back of the head] is also a trauma, that lick to the back of the head." *Id.* at 107. The pretrial order contained no stipulation that there were two blows. R.I, pp. 129–136. In context, the "stipulation" conceded for purposes of argument that the fracture on the top of the head was a "trauma," and while defense counsel was cross-examining the radiologist witness to show that the blow (the "other" trauma) to the back of the head—and not the alleged trauma at the top—had produced the fracture along the side top of the skull below the midline. (The colloquy arose after the defense asked the expert, "[W]hich one of the two traumas most likely produced what you found in the films?" The colloquy arose in a discussion of the plaintiff's objection that the radiologist witness was not competent to testify as to this causation.)

*Against this testimony, the defendant relies upon the following evidence, accepted by the trial court as preponderating:*

Dr. William B. Wilson conducted the autopsy on Williamson following his death.

Dr. Wilson is the director of pathology at the Mississippi Baptist Medical Center in Jackson, Mississippi, and he is certified as a specialist in clinical pathology and in internal medicine. The purpose of his autopsy was to determine why the patient had died following a trauma. Dr. Wilson did not find the contusion on the top of the head that Dr. Neill had observed, although he commented that his observation was one week later and "possibly it [the contusion] could have been fused out or reabsorbed.... [or] missed with what I saw as to the surgical procedure area." R.II, p. 68. He found the residual of the hematoma underneath the skull near the left temple towards the top of the skull. He also found a place underneath the scalp where blood had accumulated in the midline of the *back* of the skull, about 2–3 inches wide, with soft tissue bruising (also underneath the scalp). The bruising at the *back* was the only area of contusion this doctor found on Williamson's skull. Dr. Wilson was of the definite conviction that the hematoma toward the left temple, top, had resulted from the trauma at midline on the *back* of the skull: the back trauma had caused a "contrecoup lesion," *i. e.*, a severe jarring of the brain forward at the place of the hematoma that resulted as counter-force to the trauma where the back of the head struck a broad surface falling backward. Dr. Wilson found no other sign of trauma on the skull whatsoever. He did not find any depressed place or fracture on the skull, and he did not notice (or look for) the hairline fracture along the side (as to the causation of which he declined to venture an opinion, as outside the area of his expertise).

Dr. Thomas Neumann, a general practitioner in Tallulah, was the first doctor to examine Williamson. Williamson was brought by ambulance first to the doctor's office and then (with the doctor) to the local hospital. The doctor conducted a cursory examination. After negativing diabetic shock, the doctor ordered Williamson transferred to a large hospital in a nearby city, because he suspected skull fracture by reason of bleeding from the ear. The doctor examined Williamson's head, including its back, visually and with his hands; he found no signs of depression, blood, bruises, or lesions. That is, the doctor found no signs either of the contusion on the top of the head found by Dr. Neill, nor of the contusion (underneath the scalp) on the back of the head found by Dr. Wilson.

Dr. Craig P. Folse, a board-certified radiologist, examined the three x-rays taken of Williamson's skull and neck area on the day he was first taken to the hospital. The x-rays showed a fracture extending on the left side of the skull from back of the skull forward about two-thirds to three-fourths of the skull in length. (The district court during the testimony summarized the doctor's evidence as showing that the fracture commenced "at the left side of the midportion of the back of the head, ran around the side of his [Williamson's] head over his ear and up to just by the front part of the ear," R.II, p. 108.) The fracture involved the parietal bone, *i. e.*, the bone that makes up the left side of the skull. The crack was wider at the back of the skull and narrowed as it went frontwards. The doctor was positive there were no fractures within one or one and one-half inches of the midline (*i. e.*, in the area where Dr. Neill found a contusion on the outside of the scalp), as well as that the fracture he found was about one to one and one-half inches *below* the area of the contusion found by Dr. Neill.

██ If the district court was not in error in accepting this testimony, it clearly proves: (1) that there was only one blow of sufficient severity to produce beneath-scalp contusion and bleeding, and this blow was at the midline of the back of the skull, consistent with Williamson's head striking the pavement as he fell backwards; (2) this trauma produced the fracture along the side of the head, broader at the point of impact and narrowing frontwards; (3) this trauma also produced the hematoma in the left forward part of the tissue above the brain, by way of a contrecoup lesion; (4) there was no fracture beneath the area in which Dr. Neill found an exterior contusion; and (5) this exterior contusion (slight enough not to be noticed when the initial doctor cursorily examined the head, as well

as to be absorbed by the time of the autopsy seven days later) had no medical causation whatsoever with relation either to the hematoma (that eventually resulted in Williamson's death) or to the linear fracture along the side of the head.

### Trial Court Not Clearly Erroneous

Fed.R.Civ.P. 52(a) provides:

> . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witness.

Thus, factual findings of a district court cannot be set aside on review unless clearly erroneous. The function of the reviewing court is not to retry the issues or to substitute its judgment for that of the district court. *Dickens v. United States*, 545 F.2d 886 (5th Cir. 1977). A finding is clearly erroneous and reversible under Rule 52(a) only when "the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.

Bound by these limitations, we cannot say that the district court's findings that there was only one blow and that to the back of the head is clearly erroneous. The testimony of the medical experts accepted by the district court is equally as reasonable as is the opposing testimony of the experts relied upon by the plaintiff. Whether in fact, for instance, there was a meaningful contusion along the top of the decedent's scalp, as testified by Dr. Neill and as somewhat controverted by Drs. Wilson and Newman, depends upon a resolution of a conflict in the testimony of three honest medical experts testifying to equally reasonable observations. The trial court's resolution of this dispute is in essence a credibility call, not calling into question the subjective veracity of any witness but perhaps taking into account the circumstances in which the observations were made and the considered determination, at the time the observation was made, of the importance or not of findings. We cannot on review hold that the trial court clearly erred in accepting the apparently credible and reasonable testimony relied upon in preference to the opposing testimony. Nor can we say that the district court erred in accepting as clearly preponderating the testimony that the fracture along the side of the head primarily resulted from a single blow at the back of the skull, not from any blow on the top of the head.

The ultimate issue, of course, is whether the plaintiff proved by a preponderance of the evidence that the decedent Williamson's hematoma beneath the skull and skull fracture resulted from a blow and other tortious act by the defendant Brown. We certainly cannot say that the district court erred in finding that the highly circumstantial evidence offered by the plaintiff did not sufficiently prove the tort alleged.

### Conclusion

For the foregoing reasons we AFFIRM the judgment of the district court decreeing that the plaintiff takes nothing.

AFFIRMED.